18 MAG 7084

ORIGINAL

Approved: _____
         Ryan B. Finkel
         Assistant United States Attorney

Before:  HONORABLE STEWART D. AARON
         United States Magistrate Judge
         Southern District of New York

U.S. DISTRICT COURT FILED AUG 16 2018 S.D. OF N.Y. DS

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :   **SEALED COMPLAINT**
                              :
       - v. -                 :   Violations of
                              :   18 U.S.C. §§ 201(b)(2)(C),
DARIO QUIRUMBAY,              :   371, 1349, 1791, and 2
                              :
       Defendant.             :
                              :   COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - x   NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

DAVID R. FUSCO, being duly sworn, deposes and says that he is a Special Agent with the Department of Justice, Office of the Inspector General ("DOJ-OIG"), and charges as follows:

### COUNT ONE
### (Conspiracy)

1. In or around September 2017, in the Southern District of New York and elsewhere, DARIO QUIRUMBAY, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, (1) bribery, in violation of Title 18, United States Code, Section 201(b)(2)(C), and (2) providing contraband in prison, in violation of Title 18, United States Code, Section 1791(a)(1).

2. It was a part and object of the conspiracy that DARIO QUIRUMBAY, the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept things of value personally and for another person and entity, in return for being induced to do and omit to do an act in violation of his official duties, in violation of Title 18, United States Code, Section 201(b)(2).

3.     It was further a part and an object of the conspiracy that DARIO QUIRUMBAY, the defendant, and others known and unknown, in violation of a statute and a rule and order issued under a statute, would and did provide to inmates of a prison a prohibited object, and did attempt to do so, in violation of Title 18, United States Code, Section 1791(a)(1).

### Overt Acts

4.     In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a.     In or around September 2017, DARIO QUIRUMBAY, the defendant, received cash from a family member of an inmate to provide two cellular telephones to an inmate at the Metropolitan Correctional Center ("MCC").

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Bribery)

5.     In or around September 2017, in the Southern District of New York and elsewhere, DARIO QUIRUMBAY, the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept a thing of value, personally and for another person and entity, in return for being induced to do and omit to do an act in violation of his official duty, to wit, QUIRUMBAY, a correctional officer at the MCC, solicited and accepted payments in return for smuggling contraband, including, but not limited to, cellphones, into the MCC.

(Title 18, United States Code, Sections 201(b)(2)(C), and 2.)

### COUNT THREE
### (Providing Contraband in Prison)

6.     In or around September 2017, in the Southern District of New York and elsewhere, DARIO QUIRUMBAY, the defendant, in violation of a statute and a rule and order issued under a statute, provided to an inmate of a prison a prohibited object, and attempted to do so, to wit, QUIRUMBAY provided to inmates of

2

the MCC contraband, including, but not limited to, cellular telephones and alcohol.

(Title 18, United States Code, Sections 1791(a)(1), (b)(4), and 2.)

## COUNT FOUR
### (Conspiracy to Commit Honest Services Fraud)

7. In or around September 2017, in the Southern District of New York and elsewhere, DARIO QUIRUMBAY, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

8. It was a part and an object of the conspiracy that DARIO QUIRUMBAY, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the Federal Bureau of Prisons of its intangible right to the honest services of QUIRUMBAY, a correctional officer at the MCC, would and did transmit and cause to be transmitted by means of wire, radio and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9. I am a Special Agent with DOJ-OIG and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## The Metropolitan Correctional Center

10.  Based on my training and experience, conversations with other law enforcement officers and my review of reports and records, I know the following:

a.  The United States Marshals Service ("USMS") is a federal law enforcement agency within the United States Department of Justice.  Among other things, the USMS is responsible for the care and custody of federal inmates from the time of their arrest by a federal agency or remand by a judge until they either are acquitted, committed to their designated Federal Bureau of Prisons ("BOP") institution following a conviction, or otherwise ordered released from USMS custody.

b.  The USMS does not own or operate detention facilities; rather, the USMS houses its inmates at either state or local government facilities, BOP facilities, or private detention facilities.

c.  In New York City, the USMS houses pretrial detainees at several locations, including the MCC, which is a BOP-run federal jail located in Manhattan.

d.  The MCC employs more than 110 correctional staff, which includes Correctional Officers, Senior Officers, and Senior Officer Specialists.

e.  The primary duty of Correctional Officers, Senior Officers, and Senior Officer Specialists is to ensure the care, custody, and control of the inmate population of the MCC.  In connection with this duty, such officers participate in inspections and searches of inmates and MCC facilities, and are tasked with, among other things, ensuring that contraband is *not* brought into the MCC.

f.  According to the BOP's Standards of Employee Conduct (the "Standards of Employee Conduct"), employees of the MCC are expressly forbidden from "offer[ing] or giv[ing] to an inmate or a former inmate or any member of his/her family, or to any person known to be associated with an inmate or former inmate, any article, favor, or service that is not authorized in the performance of the employee's duties" and from "accept[ing] any gift, personal service, or favor from an inmate or former inmate, or from anyone known to be associated with or related to an inmate or former inmate."  In addition, "[i]ntroducing or attempting to introduce contraband into or upon the grounds of

4

any Federal correctional institution . . . without the CEO's [Chief Executive Officer's] knowledge and consent, is prohibited." Contraband is defined as "material prohibited by law, or by regulation, or material which can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution."

11. Based on my conversations with other law enforcement officers and my review of records from the MCC, I know the following:

  a. DARIO QUIRUMBAY, the defendant, is currently employed as a correctional officer at the MCC. QUIRUMBAY has been employed as a correctional officer at the MCC since in or around June 2016.

  b. On or about June 15, 2016, QUIRUMBAY signed a BOP form acknowledging that, among other things, he had received the Standards of Employee Conduct and agreed to conduct a thorough review of it.

  c. QUIRUMBAY provided a particular cellphone number ("Cellphone Number-1") to the BOP as his cellphone number.

## The Scheme to Smuggle Cellphones and Alcohol into the Metropolitan Correctional Center

12. Based on my conversations with witnesses, my review of BOP, and other records, I believe that DARIO QUIRUMBAY, the defendant, has abused the power entrusted to him as a correctional officer by taking a bribe in exchange for smuggling contraband to inmates housed at the MCC. QUIRUMBAY smuggled cellular phones and alcohol into the MCC. In return, QUIRUMBAY received a cash payment.

13. Based on my conversations with witnesses, law enforcement officers and my review of records of interviews with a particular inmate ("Inmate-1"), I have learned the following, in substance and in part.[1]

---

[1] Inmate-1 has been charged with, and pleaded guilty to, several crimes. Inmate-1 is cooperating with the Government in the hopes of obtaining a cooperation agreement and leniency at sentencing. Inmate-1's information has been corroborated by independent evidence, including documents and other witnesses.

a. Inmate-1 informed law enforcement officers that a guard at the MCC, who he knew as DARIO QUIRUMBAY, the defendant, introduced two cellphones and a bottle of liquor into the MCC.

b. Inmate-1 stated, in sum and substance, that he and another inmate ("Inmate-2") became friendly and sought to impress QUIRUMBAY with the purpose of convincing him to bring a cellphone into the MCC that Inmate-1 would use to communicate with his family.

c. Inmate-1 showed QUIRUMBAY photos of his friends and luxury cars to impress upon QUIRUMBAY that he had money. Ultimately, Inmate-1 offered QUIRUMBAY approximately $2,000 - $3,000 to bring a cellphone into the MCC. QUIRUMBAY initially declined, but a week or so later asked Inmate-1 how they could smuggle in the phone without it being traced back to QUIRUMBAY.

d. Inmate-1 and Inmate-2 did not have enough money for the phones and to pay QUIRUMBAY so they asked two other inmates, who Inmate-1 described as of Albanian descent and whom he knew by aliases, ("Inmate-3" and "Inmate-4") to join the deal. According to Inmate-1, it was decided that Inmate-3 would arrange to provide two cellphones and $700 in cash to Inmate-2's mother.

e. Inmate-1 told QUIRUMBAY that they had the phones and his money ready. Inmate-1 provided QUIRUMBAY a particular cellphone number, which Inmate-1 did not identify but which I believe is a particular number ("Cellphone Number-2"). QUIRUMBAY was to call Cellphone Number-2 to arrange a pickup of the cellphones and QUIRUMBAY's cash payment.

f. Inmate-1 explained to law enforcement officers that Cellphone Number-2 was the phone number of Inmate-2's relative ("CC-1"). Inmate-1 explained that Inmate-2 contacted CC-1 and arranged with CC-1 to meet with QUIRUMBAY.

g. Inmate-1 told law enforcement officers that, thereafter, QUIRUMBAY dropped off an Apple iPhone in Inmate-1's bed. A few days after that, QUIRUMBAY dropped off a cellphone charger. A few days later, per Inamte-1's request, QUIRUMBAY left a bottle of tequila behind a garbage can for Inmate-1. Inmate-1 explained to law enforcement officers that QUIRUMBAY did not charge extra for the tequila.

h. Inmate-1 recounted that approximately three days after the tequila was delivered, QUIRUMBAY delivered a second Apple iPhone to the unit in which Inmate-1 was housed and to

which QUIRUMBAY was then assigned ("Unit-1"). Then, according to Inmate-1, on or about, September 7, 2017, QUIRUMBAY delivered a second phone charger in a bag of cookies.

        i. After the second iPhone was delivered, Inmate-1 reported that QUIRUMBAY complained to Inmate-1 that he was owed money. Inmate-1 acknowledged to law enforcement officers that he understood QUIRUMBAY was paid only $700 by CC-1. According to Inmate-1, he discussed the issue with Inmate-2 and Inmate-2 told Inmate-1 that CC-1 paid QUIRUMBAY $1,000 sometime after the first payment.

        j. According to Inmate-1, in or around late December 2017, QUIRUMBAY complained to Inmate-1 that Inmate-1 crossed him and was owed more money. QUIRUMBAY told Inmate-1, in substance and in part, that he booked a trip to Hawaii expecting to be paid all of the money he was promised.

        k. Inmate-1 reported to law enforcement officers that, on or about January 11, 2018, Inmate-3 was caught with one of the QUIRUMBAY iPhones but the second iPhone had been sold to another inmate and then sold again to another inmate.

14. Based on my conversations with law enforcement officers and my review of records of an interview with Inmate-2, I have learned the following, in substance and in part.[2]

        a. Inmate-2 reported to law enforcement officers that in or around Labor Day 2017, he and Inmate-1 paid DARIO QUIRUMBAY, the defendant, to smuggle two iPhones into the MCC.

        b. Inmate-2 explained to law enforcement officers, that sometime before September 2017, he befriended Inmate-1 in Unit-1, where they both were housed. Prior to September 2017, Inmate-1 told Inmate-2 that QUIRUMBAY was open and conversational with Inmate-1 and that QUIRUMBAY agreed to smuggle into the MCC two cellphones in exchange for approximately $1,200-$1,400.

---

[2] Inmate-2 has pled guilty pursuant to a cooperation agreement to federal offenses unrelated to the bribery described herein but, Inmate-2 has not yet been sentenced. Inmate-2 was prohibited from engaging in the conduct described herein under the terms of his cooperation agreement with the Government. Inmate-2 did not initially self-report the information he provided concerning this investigation and provided it when confronted by law enforcement officers. The information provided by Inmate-2 has been corroborated, at least in part, by independent evidence and conversations with other witnesses.

7

   c. Inmate-2 explained that he and Inmate-1 could not come up with enough money so they solicited the participation of certain inmates Inmate-2 described as of Albanian descent, and for whom Inmate-2 provided aliases similar to those provided by Inmate-1 for Inmate-3 and Inmate-4. Inmate-2 explained that the plan was to sell one cellphone to Inmate-3 and Inmate-4 and keep the second for Inmate-2 and Inmate-1 to use themselves.

   d. Inmate-2 recounted to law enforcement officers that he, Inmate-3 and Inmate-4 arranged for one of Inmate-2's family members ("CC-2") to meet individuals associated with Inmate-3 and Inmate-4 in the Bronx, New York so that CC-2 could retrieve cash and two cellphones. CC-2 then passed the cellphones and cash to another family member of Inmate-2, CC-1.

   e. Inmate-2 provided CC-1's cellphone number -- Cellphone Number-2 -- to Inmate-1 so that he could, in turn, provide Cellphone Number-2 to QUIRUMBAY. Inmate-2 contacted CC-1 and told him to expect a call from someone and CC-1 was to provide the two cellphones and cash to that individual.

   f. Inmate-2 told law enforcement officers that in or around September 2017, QUIRUMBAY smuggled into the MCC two Apple iPhones within a few days of each other. Both iPhones were provided to Inmate-1. Inmate-2 also reported that Inmate-1 received alcohol from QUIRUMBAY, which Inmate-2 partially drank. Inmate-2 did not recall the type of alcohol Inmate-1 received but believed it was clear.

   g. Inmate-2 reported to law enforcement officers that after the two iPhones were smuggled inside the MCC, Inmate-2 used one of the iPhones to call CC-1. At some point, CC-1 told Inmate-2 that CC-1 met the individual that Inmate-2 knew as QUIRUMBAY at a Dunkin' Donuts in Jersey City, New Jersey. It was there that CC-1 reported to Inmate-2 that the exchange took place. CC-1 also confirmed for Inmate-2 that the man Inmate-2 knew as QUIRUMBAY called CC-1 on Cellphone Number-2 and that CC-1 attempted to call him back but the phone number that man (QUIRUMBAY) used did not accept calls.

   h. Inmate-2 recounted for law enforcement officers a conversation he had with QUIRUMBAY in or around September 2017, shortly before QUIRUMBAY was transferred to another housing unit. QUIRUMBAY told Inmate-2 that he had smuggled the iPhones into the MCC and that he knew CC-1 was Inmate-2's uncle.

8

        i.    Soon after the two iPhones were smuggled into the MCC, one was confiscated from Inmate-3.

        j.    Inmate-2 recalled that Inmate-1 had told him that QUIRUMBAY accepted the bribe because QUIRUMBAY needed money for a vacation.

15.    Based on my conversations with law enforcement officers and my review of records of interviews with a particular individual, CC-1, I have learned the following, in substance and in part:

        a.    CC-1 told law enforcement officers that he is Inmate-2's uncle. CC-1 recalled that Inmate-2 called him and asked that he meet an individual ("Individual-1") CC-1 did not know in the Bronx, New York.

        i.    I believe that Individual-1 is CC-2 because CC-1 provided law enforcement officers a screen shot of a text message conversation ("Conversation-1") CC-1 had with Individual-1. In Conversation-1, Individual-1 identified himself with a first name similar to the first name Inmate-2 called CC-2. That text message conversation reveals that CC-2 sent CC-1 an address in the Bronx on or about September 2, 2017, and that CC-1 responded in Spanish, in substance and in part, I arrive in five minutes. Approximately, one week later, Individual-1 asked CC-1 if he had spoken with Inmate-2.

        b.    CC-1 reported to law enforcement officers, that ultimately, CC-1 met CC-2 and received from him two Apple iPhones and $1,000 cash in an envelope. CC-1 told law enforcement officers that he counted the money and confirmed it contained $1,000 before he left the meeting with CC-2 in the Bronx, New York.

        c.    Shortly after the meeting in the Bronx with CC-2, CC-1 told law enforcement officers that Inmate-2 called CC-1 and told him to expect a call from another individual soon.

        d.    A few days later, CC-1 received a call from an unknown male and that male arranged to meet CC-1 in the parking lot of a particular Dunkin' Donuts in Union City, New Jersey ("Dunkin' Donuts-1") on a date CC-1 could not recall at approximately 10:00 p.m.

        e.    CC-1 recounted to law enforcement officers that he did, in fact, meet that individual, who CC-1 did not know, but

who I believe is DARIO QUIRUMBAY, the defendant, at Dunkin' Donuts-1. CC-1 gave to the man I believe was QUIRUMBAY the two Apple iPhones and $1,000. CC-1 stated that he was unable to clearly see the individual's face or any car he drove.

      f.  Days after this meeting, CC-1 received a call from Inmate-2 from a phone that CC-1 believed was not a sanctioned BOP phone because sanctioned BOP phones contain a prerecorded message before the call begins. On this occasion when Inmate-2 called, there was no prerecorded message.

### Corroboration of Witness Statements Regarding the Scheme to Smuggle Cellphones and Alcohol into the Metropolitan Correctional Center

    16.  Based on my review of records maintained by the BOP and the MCC I have learned the following, in substance and in part:

      a.  Inmate-1 was housed in the MCC in the summer and fall of 2017. In or around August 2017 and September 2017, Inmate-1 resided in Unit-1.

      b.  Inmate-2 was housed in the MCC in the summer and fall of 2017 through approximately in or around October 2017. In or around August 2017 up to approximately in or around October 2017, Inmate-2 resided in Unit-1.

      c.  Inmate-3 was housed in the MCC in the summer and fall of 2017. In or around August 2017 and September 2017, Inmate-3 resided in Unit-1.

      d.  Inmate-4 was housed in the MCC in the summer and fall of 2017. In or around August 2017 and September 2017, Inmate-4 resided in Unit-1.

      e.  From in or around June 2017 through in or around January 2018, DARIO QUIRUMBAY, the defendant, was at various times assigned to Unit-1 in the MCC.

      f.  Based on my training and experience, I have learned that correctional officers at the MCC are able to freely move about the facility and enter or leave a unit even if they are not specifically assigned to that unit on that particular day.

    17.  Based on my training and experience and review of cell site location data from Cellphone Number-1 and Cellphone Number-2

that was made available to law enforcement officers pursuant to a warrant signed by Magistrate Judge Katharine H. Parker, I have learned the following, in substance and in part:

    a. Certain cellphone providers record the approximate location of a cellphone when it receives a call or text, sends a call or text, or accesses the internet.

    b. On or about September 8, 2017, the phones associated with Cellphone Number-1 and Cellphone Number-2 were in the same approximate area within a few blocks of Dunkin' Donuts-1.

    c. Specifically, based on cell site location data reviewed by law enforcement agents, on or about September 8, 2017, the phone associated with Cellphone-1 was within a few blocks of Dunkin' Donuts-1 from approximately 5:13 p.m. – 5:26 p.m. and the phone associated with Cellphone Number-2 was within several blocks of that same location at approximately 5:47 p.m.

18. Based on records maintained by the BOP and the MCC, I have learned the following, in substance and in part:

    a. On or about September 14, 2017, an Apple iPhone was confiscated from Inmate-3. That iPhone has since been destroyed by the BOP.

    b. On or about January 4, 2018, two Apple iPhones were recovered in Unit-1 based on a tip provided to law enforcement officers from Inmate-1.

    c. Based on my involvement in this investigation, I believe that two of these three Apple iPhones were smuggled into the MCC by DARIO QUIRUMBAY, the defendant.

19. Based on my review of bank records and credit card records associated with DARIO QUIRUMBAY, the defendant, I have learned the following, in substance and in part:

    a. On or about September 11, 2017, QUIRUMBAY made a $1,000 payment on his credit card bill.

    b. On or about September 12, 2017, QUIRUMBAY's credit card reflects two ticket purchases from United Airlines.

        c. On or about October 1, 2017, QUIRUMBAY's credit card statement reflects a $602.09 purchase at a Louis Vutton store in Waikiki, Honolulu, Hawaii.

    20. Based on my review of records from United Airlines, I have learned the following, in substance an in part:

        a. On or about September 29, 2017, DARIO QUIRUMBAY, the defendant, and a companion, flew from Newark Airport in New Jersey to Daniel K. Inouye Airport in Honolulu, Hawaii.

        b. On or about October 6, 2017, QUIRUMBAY flew from Daniel K. Inouye Airport in Honolulu, Hawaii to Newark Airport in New Jersey.

    WHEREFORE, I respectfully request that an arrest warrant be issued for DARIO QUIRUMBAY, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_David R. Fusco_
David R. Fusco
Special Agent
Department of Justice, Office of the Inspector General

Sworn to before me this
16th day of August, 2018

_signature_
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK